**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| DAVID GRAFE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:19-cv-00941-TWP-TAB |
| | ) |
| DUSHAN ZETECKY, Warden, | ) |
| WEXFORD OF INDIANA, LLC, | ) |
| PAUL A. TALBOT, M.D., | ) |
| V. SHEPHERD, | ) |
| LAURA BODKIN, | ) |
| MICHELLE LAFLOWER, | ) |
| BECKY DAVIS, | ) |
| THOMPSON, Nurse, | ) |
| | ) |
| Defendants. | ) |

**ENTRY GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on Motions for Summary Judgment filed by the Defendants, Dushan Zatecky (misspelled Zetecky in the complaint), Veyona Shepherd ("Ms. Shepherd"), and Laura Bodkin ("Ms. Bodkin"), (collectively "the State Defendants"), (Dkt. 100), and Wexford of Indiana, LLC ("Wexford"), Paul A. Talbot ("Dr. Talbot"), Michelle LaFlower ("Ms. LaFlower"), Rebecca Davis ("Nurse Davis"), and Danielle Thompson ("Nurse Thompson") (collectively "the Medical Defendants"), (Dkt. 90). Plaintiff David Grafe ("Grafe"), an Indiana state prisoner, initiated this 42 U.S.C. § 1983 civil rights action alleging the individual defendants failed to provide medical care following an injury. As to Wexford, Grafe alleges that it has a policy of denying medical care because of costs. (Dkt. 8 at 2.) For the reasons explained in this Entry, the Defendants' Motions are **granted.**

**I. SUMMARY JUDGMENT STANDARD**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). The court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## II.  STATEMENT OF FACTS

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Grafe as the non-moving party with respect to the Motions for Summary Judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Dr. Talbot is a physician licensed to practice medicine in the State of Indiana. During all times relevant to the Complaint, Dr. Talbot was employed as a physician by Wexford at the Pendleton Correctional Facility in Pendleton, Indiana ("Pendleton"). (Dkt. 92-2, ¶ 1-2.)

All relevant times, Grafe was a prisoner at Pendleton. Grafe is confined in the infirmary dorm at Pendleton because of his medical issues. (Dkt. 92-6 at 9.) He has chronic medical conditions consisting of a painful left hip (since 2001), Crohn's disease (since 2016), and hypothyroidism (since 2016). (Dkt. 92-1 at 29; Dkt. 92-6 at 51.) On July 5, 2018, Dr. Talbot ordered Grafe a bottom-bunk pass and low-range pass for six months due to his chronic medical conditions. (Dkt. 92-1 at 33; Dkt. 92-2, ¶ 4.)

Dr. Talbot met with Grafe on October 5, 2018, for a chronic care visit. (Dkt. 92-1 at 29-32; Dkt. 92-2, ¶ 5.) Grafe had been walking with a cane for several years by the time of this appointment. (Dkt. 92-6 at 31.) During his examination, he described his hip pain as sharp and aggravated by prolonged standing, sitting, and squatting. (Dkt. 92-1 at 29-32; Dkt. 92-2, ¶ 5.) He was experiencing decreased mobility, limping, joint pain, and tenderness to his hip, and his daily activities were limited due to pain. *Id.* Dr. Talbot determined that Grafe had an acquired deformity of the hip. *Id.* Dr. Talbot ordered that Grafe continue to use the cane and also discussed the limitations he faced regarding pain control as Grafe did not wish to use nonsteroidal anti-inflammatory drugs. *Id.* Because of his Crohn's disease, Grafe could not take anti-inflammatory medications. (Dkt. 92-6 at 48.) Based on Grafe's hip pain, and the length of time he had been experiencing pain, Dr. Talbot submitted an out-patient request for Grafe to receive surgery to his left hip. (Dkt. 92-1 at 29-32; Dkt. 92-2, ¶ 5.)

On October 8, 2018, Dr. Talbot's request that Grafe have hip replacement surgery was denied and an alternative treatment plan was recommended. (Dkt. 92-1 at 27; Dkt. 92-2, ¶ 6.) It was recommended that Grafe first try physical therapy for four weeks prior to obtaining an offsite consult for hip surgery. *Id.* The physical therapy was implemented to establish a stretching

3

program in preparation for any future needs, as it was opined that Grafe was "high risk" for surgery due to his other medical conditions. *Id.*

On October 12, 2018, Dr. Talbot met with Grafe to discuss the treatment plan for his hip pain. (Dkt. 92-1 at 24-26; Dkt. 92-2, ¶ 7.) They discussed the approval of four (4) sessions of physical therapy and how he was deemed high risk because of his other medical complications. *Id.* Grafe said that he understood being classified as high risk for surgery. *Id.* Dr. Talbot offered Tylenol, Mobic, and Prednisone to help with the pain, but Grafe reported that he would continue to bear the pain without the Mobic or Prednisone and would submit a sick-call request if his symptoms or pain became worse. *Id.* Grafe reiterated that he wanted to be considered for a hip replacement in the future when he felt better after completing his treatment regimen for his Crohn's disease. *Id.*

On October 18, 2018, Grafe was walking from the chow building when two offenders running with a gurney, one pushing and one pulling it, came around a corner and lost control of the gurney. (Dkt. 92-6 at 17-19.) The gurney swung around and struck Grafe in his hip area, causing him to fall to the ground. *Id.* at 19. He landed on his back, butt, and head. *Id.*

Nurse Thompson and Nurse Davis were following the men with the gurney. *Id.* at 20-21. Nurse Thompson immediately asked Grafe if he was all right, and he responded that he was not sure. *Id.* at 22-23. Another offender helped Grafe get up and Nurse Thompson handed him his cane and a little bag of paperwork he had been carrying. *Id.* at 23. After Nurse Thompson spoke with Grafe, Nurse Davis passed by, and the offenders and nurses continued on their way. *Id.* at 23-24. Grafe did not ask either Nurse Thompson or Nurse Davis to remain with him, nor did he request any additional assistance when the injury occurred. *Id.* at 25. Grafe then returned to his dorm. *Id.*

at 23. When he bent down to get into his lower locker, he could not get up because of the pain. *Id.* at 24. He was then taken to the infirmary in a wheelchair. *Id.*

When Grafe arrived in the infirmary, Nurse Thompson contacted Dr. Talbot regarding Grafe's hip pain. Dr. Talbot ordered a Toradol injection for the pain, which Nurse Thompson administered, and a three day medical lay-in for Grafe's meals and medication. (Dkt. 92-2, ¶ 8; Dkt. 92-1 at 22.) Grafe was returned to his cell that same afternoon. (Dkt. 92-4, ¶ 7.)

Grafe submitted a request for health care on October 20, 2018, complaining that his feet were swollen so big he could not put on his shoes and he was still experiencing hip and back pain. (Dkt. 98-2 at 2; Dkt. 92-6 at 27-28.) That same day, Grafe saw Lisa Zvyak, R.N., and reported that he was still experiencing 10/10 pain in his left hip, lower back and middle back after the incident with the gurney. (Dkt. 92-2, ¶ 9; Dkt. 92-1 at 19-21.) The Toradol injection helped take the edge off his pain. (Dkt. 92-2, ¶ 9; Dkt. 92-1 at 21.) Grafe was given another three day medical lay-in and Nurse Zvyak noted that she would refer the matter to the physician for "possible x-rays and something for pain." (Dkt. 92-1 at 21.) Grafe was given another Toradol injection for pain. (Dkt. 97 at ¶ 29.)

Grafe had his first of four sessions of physical therapy with Dana Miller, PT, on October 25, 2018. (Dkt. 92-2, ¶ 10; Dkt. 92-1 at 17.) Ms. Miller noted that Grafe was deemed a high risk surgical candidate due to his Crohn's disease. (Dkt. 92-1 at 17.) He was given exercises but told to delay starting them until he saw the doctor and a hip fracture was ruled out. *Id.*

Dr. Talbot saw Grafe on October 29, 2018. (Dkt. 92-2, ¶ 11; Dkt. 92-1 at 12-16.) Grafe told Dr. Talbot about the October 18, 2018 medical gurney incident and reported that he was still having hip and low back pain. *Id.* Dr. Talbot ordered a short course of Tylenol, a bottom-bunk pass, a low range pass, and that Grafe continue his cane pass. *Id.* Dr. Talbot also ordered x-rays

5

for Grafe's hips, pelvis and spine. *Id.* The bottom-bunk and low range passes were issued through October 28, 2019. *Id.* Grafe was ordered to be on a six month medical lay-in, which would allow him to have his medication and meals delivered to him until April 30, 2019. *Id.*

On November 2, 2018, Grafe submitted a request for health care, asking for a copy of his blood work and x-rays and the doctor's appointment notes. (Dkt. 92-6 at 41.)

Grafe saw the physical therapist three more times, on November 5, November 29, and December 10, 2018. (Dkt. 92-2, ¶ 12; Dkt. 92-1 at 4-10.)

Dr. Talbot met with Grafe again on December 20, 2018, for a chronic care visit. (Dkt. 92-2, ¶ 13; Dkt. 92-1 at 1-3.) During that visit, Grafe reported no new concerns about his Crohn's disease or his hypothyroidism. *Id.* Grafe stated that he felt well except for the pain in his hip. *Id.*

Grafe did not like to take much pain medication "no matter how much pain [he] was going through." (Dkt. 92-6 at 69.) When the pain intensified following the gurney injury, he "just tried to deal with it best [he] could." *Id.* The six month medical lay-in helped improve the swelling of his feet. *Id.* at 69-70. Grafe tried to talk to Dr. Talbot about his hip pain in February, May, and June of 2019, but Dr. Talbot did not want to talk about it. *Id.* at 54-55.

In October 2019, Grafe was referred for an outside medical consultation at OrthoIndy to discuss his hip pain. *Id.* at 50. X-rays were taken and hip replacement surgery was scheduled two and half months later. *Id.* In January 2020, Grafe was sent offsite to Eskenazi Hospital, where he received hip surgery. *Id.* at 50-51.

Nurse Thompson is a registered nurse employed by Wexford who worked at Pendleton from April 1, 2017 through November 2018. (Dkt. 92-4, ¶¶ 1-2.) On the afternoon of October 18, 2018, after Grafe was knocked down by the gurney and helped to his feet, Nurse Thompson asked him several times if he was okay. (Dkt. 92-4, ¶ 6.) Grafe was visibly angry about the incident but

walked away from the scene. *Id.* Nurse Thompson continued on with the individuals with the stretcher to respond to the signal 3000 emergency. *Id.* As a registered nurse with Wexford, Nurse Thompson did not have the authority to order specific treatment plans or provide prescription medication to patients without first consulting with a supervising physician and receiving orders. (Dkt. 92-4 ¶ 5.)

Nurse Davis is a registered nurse employed by Wexford who worked at all relevant times at Pendleton. (Dkt. 92-3 ¶¶ 1-2.) The only contact Nurse Davis had with Grafe was on October 18, 2018, when Nurse Davis was responding to a signal 3000 medical emergency with three other individuals, including Nurse Thompson. *Id.* ¶ 6. After the gurney accidentally struck Grafe and knocked him to the ground, Nurse Davis was aware that Nurse Thompson assessed Grafe to make sure he was okay. *Id.* Grafe then continued walking in the direction he was heading prior to the gurney accident. Nurse Davis continued to accompany the individuals with the stretcher to respond to the signal 3000 emergency. *Id.* Nurse Davis did not observe any injuries on Grafe. *Id.* She did not believe his condition constituted any type of emergency. *Id.* ¶ 7.

Ms. LaFlower was employed by Wexford as the Health Services Administrator ("HSA") at Pendleton from October 2017 until March 10, 2019. (Dkt. 92-5, ¶ 1.) As the HSA, Ms. LaFlower was responsible for managing the facility's overall health care system and monitoring all health service contract activities. *Id.* ¶ 3. She acted as a liaison between Health Services and the facility's administration, department heads and subordinates. *Id.* In this role, she did not have significant amounts of direct patient care as she was the administrative manager of the on-site Health Services Department. *Id.*

As the HSA, Ms. LaFlower had no authority to order or provide specific medical treatment for any offender at Pendleton. *Id.* ¶ 4. She did not formulate treatment plans for offenders nor

7

could she override the medical judgment of the staff physicians at the facility. *Id.* Ms. LaFlower did not provide, nor was she authorized to provide, any direct medical care to Grafe for his complaints regarding the incident that occurred in October 2018. *Id.* ⁋ 8. Ms. LaFlower did not evaluate Grafe for any of his medical conditions and she never denied any medically necessary treatment to Grafe. *Id.*, ⁋ 9. She was not Grafe's treating medical provider. *Id.*

As the HSA, Ms. LaFlower reviewed and responded to an informal grievance submitted by Grafe on October 21, 2018, in which he indicated that he was hit by an out-of-control gurney during a signal 3000. *Id.,* ⁋ 5; Dkt. 92-1 at 35. Grafe reported that the wheel on the gurney was broken, which caused the gurney to hit him and knock him to the ground. *Id.* He reported that Nurses Thompson and Davis were both present when this incident occurred, but they did not call another signal 3000 as he believes they should have done. *Id.* He reported having pain in his left hip, right thigh, and middle to low back. (Dkt. 92-1 at 35.)

Ms. LaFlower responded to Grafe that after reviewing his medical records, it appeared that he was seen two times in October 2018 by members of the medical staff. (Dkt. 92-5, ⁋ 6; Dkt. 92-1 at 35.) She further noted that he received treatment and a three day medical lay-in on October 18, 2018, the lay-in was extended for another three days on October 20, 2018, and no additional requests for medical care had been received. *Id.*

Although Ms. LaFlower did receive other informal grievances from Grafe during the time she was the HSA at Pendleton, none of them were related to the allegations in his Complaint. (Dkt. 92-5, ⁋ 7; Dkt. 92-1 at 34, 36-37.) After October 21, 2018, Ms. LaFlower did not receive any other grievances from Grafe regarding the injury that occurred on October 18, 2018. (Dkt. 92-5 ⁋ 7.) The only direct interaction Ms. LaFlower had with Grafe, as it relates to the allegations in his Complaint, was the response she provided to his informal grievance dated October 21, 2018. *Id.*

¶ 10.

Grafe submitted another grievance on October 30, 2018, recounting the gurney accident. (Dkt. 100-1 at 1.)  In this grievance, he stated that "treatment is'nt [sic] the issue being grieved." *Id.* Instead, he requested that nurses get more training on when to call a signal 3000 and that there be classes for Wexford offender workers on how to safely work a gurney and other hospital equipment. *Id.*  After the grievance was returned three times for errors, *id.* at 9-11, Grafe resubmitted it asking 1) for classes for offender hospital detail workers so that they could learn how to safely operate equipment, 2) the prison to not allow offenders that are not assigned to medical detail to run hospital equipment, 3) that the broken gurney be repaired, and 4) for the facility to not use unsafe equipment. *Id.* at 7.

On November 28, 2018, the Grievance Specialist, Ms. Shepherd denied the grievance. *Id.* at 14.  In this denial, Ms. Shepherd noted: "Per HSA, it was a medical equipment malfunction and not the lack of training. The medical equipment malfunction has been addressed and taken care of. Based on this information there is no other relief I can offer." *Id.*

Grafe filed a grievance appeal. *Id.* at 12.  On December 11, 2018, Warden Zatecky denied the appeal. *Id.*  In his denial the Warden noted,

> I am not a medical professional therefore I must rely on those who are when pertaining to medical issues.  Per Medical, it was a not a lack of training, it was a medical equipment malfunction. The medical equipment has been addressed and is in working order. I can offer no further relief at this level.

*Id.*

Grafe then appealed the Warden's decision and on December 18, 2018, Ms. Bodkin, an Administrative Assistant who supervised Ms. Shepherd at the time, issued a receipt of administrative remedy and forwarded the appeal to the Medical Department for review. *Id.* at 13-14; Dkt. 100-3 ¶ 3.  Ms. Bodkin's only involvement with Grafe's grievance process was logging in

9

his request for a formal appeal and sending him a receipt on December 18, 2018. Dkt. 100-3, ¶ 8.

The administrative appeal was denied. Dkt. 100-1 at 14. Ms. Shepherd noted: "Medical noted that the gurney was faulty and this has been rectified. … Your appeal was referred to the Division of Clinical Health Care Services for review. In consultation with Department medical personnel, your records have been reviewed and care is appropriate at this time. Grievance appeal denied." *Id.*

### III. DISCUSSION

At all times relevant, Grafe was a convicted prisoner. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011).

"[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…." *Arnett,* 658 F.3d at 754. Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id*. "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d

1063, 1073 (7th Cir. 2012).

For purposes of the Motions for Summary Judgment, the State and Medical Defendants do not dispute that Grafe's hip pain and injury presented a serious medical condition. The dispositive issue is whether the Defendants knew about Grafe's severe hip pain but disregarded that pain. The Court will first discuss the claims against the State Defendants before turning to the claims against the Medical Defendants.

### A.   Claims Against State Defendants

#### 1.   Warden Zatecky

Grafe argues that Warden Zatecky failed to comply with various Indiana Department of Correction ("IDOC") policies relating to the safety of medical equipment and not allowing non-medical offender workers to respond to medical emergencies. (Dkt. 92-6 at 63-65; Dkt. 108 at 8-11.) This claim fails as a matter of law because a violation of a prison policy or state law does not support a constitutional claim. *See Beley v. City of Chicago,* 901 F.3d 823, 828 (7th Cir. 2018) ("Mere violation of a state statute does not infringe the federal Constitution.") (internal quotation omitted).

Grafe also believes the Warden should have contacted medical staff and directed them to refer Grafe to see a specialist at OrthoIndy. (Dkt. 92-6 at 66-67.) In his response to the Medical Defendants' Motion for Summary Judgment, Grafe acknowledges that Warden Zatecky is not a medical professional and that the Warden can reasonably rely on the decisions made by medical staff. (Dkt. 108 at 8.) "Non-medical officials are presumptively entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care." *Eagan v. Dempsey*, No. 17-3184, 2021 WL 456002, at *18 (7th Cir. Feb. 9, 2021) (internal quotation omitted); *see also Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) ("We have long

11

recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment."). The Warden did not violate Grafe's constitutional rights by deferring to medical providers' treatment decisions.

There is no evidence that Warden Zatecky was aware of the broken gurney or that it might present a risk of harm before the accident. Grafe never spoke with the Warden about the broken gurney or his medical treatment. Dkt. 92-6 at 65. Warden Zatecky's only interaction with Grafe was his response to Grafe's grievance appeal, telling Grafe that the medical equipment malfunction had been addressed and that because the Warden was not a medical professional, he had to rely on those who are. *Id.* at 66. This was a reasonable and lawful response. Warden Zatecky is entitled to judgment as a matter of law.

### 2.     Ms. Shepherd and Ms. Bodkin

Grafe is suing Ms. Shepherd because she is a Grievance Specialist and he believes she did not provide adequate care or review of medical care and treatment.  (Dkt. 92-6 at 56.)  Grafe believes that Ms. Shepherd had the authority to tell Wexford and medical staff to comply with policy and do their jobs. *Id.* at 60-61.  Ms. Shepherd reviewed and responded to Grafe's grievance and appeal, reporting that the gurney malfunction had been taken care of.

Similarly, Grafe is suing Ms. Bodkin because he believes she should have provided adequate review and medical care and treatment and because she did not adequately review the paperwork that was given to her. (Dkt. 92-6 at 61-63.) As the Administrative Assistant who supervised the Grievance Specialist, Ms. Bodkin merely logged in Grafe's request for a formal appeal and sent him a receipt for that appeal.

Grafe has designated no admissible evidence to support his belief that Ms. Shepherd and Ms. Bodkin had the authority to direct his medical care. Although the Court draws inferences in Grafe's favor, "our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Estate of Biegert by Biegert v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020) (internal quotation omitted); *see also Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) ("[S]peculation is not sufficient to survive summary judgment; there must be evidence.") (internal quotation omitted).

Grafe also argues that Defendants Shepherd and Bodkin violated his constitutional rights by failing to provide training and other relief he sought in his grievances. (Dkt. 108 at 8-9.) It is well-settled that denying an inmate's grievance or refusing to investigate an incident after the fact does not, by itself, amount to a constitutional violation. *See e.g.*, *McGee v. Adams*, 721 F.3d 474, 485 (7th Cir. 2013) ("McGee's claims against . . . the individuals who ruled against McGee on the institutional grievances he filed . . . fail as a matter of law . . . ."); *George v. Smith*, 507 F.3d 605, 609–610 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation. A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not.").

The fact that Ms. Shepherd investigated his grievances and conveyed information she received from medical staff does not invoke liability. Ms. Bodkin had even less involvement with Grafe's grievance, merely logging and receipting the appeal.

For these reasons, no reasonable jury could find that Ms. Shepherd or Ms. Bodkin violated Grafe's constitutional rights.

**B.     Claims Against Medical Defendants**

### 1. Dr. Talbot

Grafe is suing Dr. Talbot because he believes Dr. Talbot delayed his treatment for 15 months, allowing him to suffer pain, from October 18, 2018 until he had surgery on January 9, 2020. (Dkt. 92-6 at 32-33.)

Grafe suffered for many years with chronic hip pain, long before he was hit by the gurney. Several days before the gurney accident, Dr. Talbot submitted a request that Grafe be approved for outpatient surgery on his hip. That request was denied, however, and the recommendation was that Grafe receive physical therapy. Grafe was considered a poor surgical candidate because of his other medical conditions. On October 8, 2018, he was prescribed four sessions of physical therapy. His last physical therapy session was on January 5, 2019.

The October 18, 2018 accident exacerbated Grafe's hip pain. The day of the injury, Dr. Talbot ordered an injection of Toradol for pain and a three (3) day medical lay-in. On October 20, 2018, Grafe was given another three (3) day medical lay-in and was referred to the doctor for possible x-rays. When Dr. Talbot saw Grafe on October 29, 2018, he gave Grafe pain medication and ordered x-rays. Grafe was seen again by medical staff on October 30, 2018, and his medical lay-in was extended through April 30, 2019. Dr. Talbot extended Grafe's lower bunk and lower range passes through October 28, 2019.

After October 20, 2018, Grafe did not submit any requests for medical care for his hip. His October 30, 2018, grievance explicitly stated that "treatment" was not the issue being grieved. Rather, he wanted more training for nurses and offender workers. He testified in his deposition that he did not file more requests for health care complaining about his hip pain because he was "not trying to be overbearing with the … with this medical staff." (Dkt. 92-6 at 48-49.) His complete set of medical records was not presented by any party, but based on deposition and

affidavit testimony, it is evident that Grafe was seen by Dr. Talbot several times in late 2018 and throughout 2019. (Dkt. 92-6 at 54-55.) Grafe does not contend that he suffered a fracture nor does any evidence suggest that. In October 2019, Grafe was seen at OrthoIndy and ultimately had hip surgery in January 2020, after this lawsuit was filed.

The Seventh Circuit has held that a prisoner may show deliberate indifference by showing that a medical provider persisted "in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 729-730. Deliberate indifference may also be shown by "an inexplicable delay in treatment which serves no penological interest." *Id.* (citing cases); *see also Howell v. Wexford Health Sources, Inc.*, No. 19-3210, _ F.3d _, 2021 WL 405006, at *3 (7th Cir. Feb. 5, 2021) ("Denying or delaying appropriate treatment to an incarcerated person suffering from avoidable pain can violate the Eighth Amendment."); *Miller v. Campanella*, 794 F. 3d 878, 880 (7th Cir. 2015); *Perez v. Fenoglio*, 792 F.3d 768, 777–78 (7th Cir. 2015) ("A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain."); *Gomez v. Randall,* 680 F.3d 859, 865-66 (7th Cir. 2012) (same); *Arnett*, 658 F.3d at 752 (same).

"To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties,* 836 F.3d at 730-31. "Most importantly, the plaintiff must show that the defendant's actions or inaction caused the delay in his treatment." *Walker*, 940 F.3d at 964.

Grafe has presented no evidence showing that Dr. Talbot delayed necessary treatment. The fact that Dr. Talbot did not examine Grafe until ten (10) days after the accident is not actionable because Grafe saw nursing staff who carried out Dr. Talbot's orders immediately after the accident. Nothing in the record supports an inference that at some specific time earlier than October 2019,

Dr. Talbot believed that another orthopedic consultation should have been requested to address Grafe's chronic hip pain. Grafe himself did not submit any requests for health care complaining about his pain or lack of treatment. There is no evidence that Dr. Talbot's "subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under those circumstances." *Petties,* 836 F.3d at 729 (internal quotation omitted). No reasonable jury could find that Dr. Talbot was deliberately indifferent to Grafe's hip pain.

### 2. **Wexford**

Although a private entity, Wexford acts under color of state law and therefore may be liable for violating Grafe's Eighth Amendment rights under the theory announced in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *See also Walker*, 940 F.3d at 966. "Prevailing on such a claim requires evidence that a Wexford policy, practice, or custom caused" the deliberate indifference. *Id.* "It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017).

Grafe is suing Wexford because he believes medical staff were aware of his medical needs but refused to provide adequate treatment. (Dkt. 92-6 at 38.) He also alleges that Wexford has a policy of denying medical care to reduce costs. He argues more specifically that Wexford failed to comply with IDOC policy 01-02-101, Development and Delivery of Health Care Services. (Dkt. 97 at 15; Dkt. 109-5.)

Grafe contends that Wexford violated the IDOC Health Care Services policy requiring that "adequate health care services necessary to address serious medical conditions are provided" to all inmates "in accordance with appropriate standards." (Dkt. 97 at 16; Dkt. 109-5 at 4.) Grafe,

16

however, has failed to present any evidence that treatment he received was outside the scope of applicable health care standards.

He further contends that Wexford violated the IDOC policy provision prohibiting offenders from providing "any type of direct patient care services" by allowing a non-medical staff offender to handle and lose control of the gurney. (Dkt. 97 at 16; Dkt. 109-5 at 10.) No evidence, however, suggests that merely transporting a gurney constitutes providing direct patient care when nurses are in attendance.

Grafe has failed to designate evidence showing that any Wexford custom or policy caused the denial of necessary medical care. No reasonable jury could find that Wexford was deliberately indifferent to his serious medical needs.

### 3. Ms. LaFlower

Grafe is suing HSA LaFlower because he believes she failed to have the gurney that hit him fixed, in violation of IDOC policy. (Dkt. 92-6 at 34-37.) Grafe does not argue that Ms. LaFlower was deliberately indifferent to his medical care. *Id.* at 36.

Ms. LaFlower is entitled to judgment as a matter of law because a violation of a prison policy or state law does not support a constitutional claim. *See Beley v. City of Chicago,* 901 F.3d 823, 828 (7th Cir. 2018) ("Mere violation of a state statute does not infringe the federal Constitution.") (internal quotation omitted). In addition, as a member of the administrative staff, Ms. LaFlower could defer to the medical providers' judgment as long as she was responsive to Grafe. *Id.* at 440 ("As a nonmedical administrator, Peterman was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate plaintiff].").

Ms. LaFlower had no authority to provide medical treatment to Grafe or to override decisions made by the physicians. Moreover, Ms. LaFlower's only involvement with Grafe

17

relating to his claims in this case was her review of a single informal grievance.

No reasonable jury could find that Ms. LaFlower violated Grafe's constitutional rights. She is entitled to summary judgment in her favor.

### 4. **Nurse Thompson**

Grafe alleges that Nurse Thompson failed to call for a medical emergency at the time the gurney struck him, and instead left him on his own. (Dkt. 5 at 4.) He further alleges that after October 18, 2018, Nurse Thompson failed to make sure Grafe received proper medical care for his hip. *Id.*

Grafe's argument that Nurse Thompson should have done more on the scene of the accident is dispelled by his own testimony. He testified in his deposition that Nurse Thompson asked him if he was okay. He did not tell her that he was in pain. His contention that Nurse Thompson "should have known" that victims of accidents often do not know at the time if they are injured, (Dkt. 97 at 10), lacks any evidentiary support. Nurse Thompson was already on her way to a medical emergency and because Grafe did not complain or ask for immediate treatment, no reasonable jury could find that she was deliberately indifferent to any serious medical need at that time.

Grafe then walked away to his dorm. It was not until after he returned to his dorm and squatted down that he experienced more severe pain. He was then taken to the infirmary in a wheelchair. It is undisputed that Nurse Thompson gave Grafe a Toradol injection on the day of his injury, as ordered by Dr. Talbot.

Grafe further claims that after October 18, 2018, Nurse Thompson failed to make sure Grafe received proper medical care for his hip, (Dkt. 5 at 4), but there is no evidence that Grafe requested or needed treatment that she denied. Nurse Thompson had no further interactions with

Grafe. She stopped working at Pendleton the month following the gurney accident.

In addition, no reasonable jury could find that Nurse Thompson knowingly turned a blind eye to any inappropriate or harmful treatment provided by any other medical provider. *See e.g., Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) ("Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."). Grafe has failed to designate any evidence that would support a finding that Nurse Thompson actually knew of and disregarded a substantial risk of harm. Nurse Thompson is entitled to summary judgment in her favor.

### 5. Nurse Davis

Grafe is suing Nurse Davis because on October 18, 2018, at the scene of the accident, she failed to properly address his injuries, put him on a gurney, or help him to see medical staff and call another signal 3000 medical emergency. (Dkt. 92-6 at 16-17.) As with his claim against Nurse Thompson, his assertion that Nurse Davis "should have known" that victims often do not know at the time if they are injured in a high impact accident, (Dkt. 97 at 12), is mere conjecture.

The undisputed evidence shows that Nurse Davis was aware that another nurse on the scene asked Grafe if he was okay. She also knew that Grafe did not complain of any injuries and he was able to walk away following the accident. There is no evidence that Nurse Davis had any reason to believe, nor did she believe, that Grafe needed emergency treatment at that time. This was the only time Nurse Davis had any contact with Grafe. No reasonable jury could conclude that she was deliberately indifferent to any serious medical condition.

### IV. CONCLUSION

For the reasons discussed above, the Defendants' Motions for Summary Judgment, Dkt.

[90] and Dkt. [100], are **GRANTED.**  Final judgment consistent with this Entry shall now issue.

    **SO ORDERED.**

Date: 2/25/2021

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

David Grafe, #882972
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Nancy Kay Goldburg
INDIANA ATTORNEY GENERAL'S OFFICE
nancy.goldburg@atg.in.gov

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com